UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | Case Nos. | 3:03-CR-22 (AVC) |
| | | | 3:03-CR-272 (AVC) |
| | : | | |
| v. | : | | |
| | : | February 4, 2005 | |
| FRANK S. CHUANG | : | | |

**SENTENCING MEMORANDUM**

The Government respectfully submits this memorandum in aid of sentencing, which has

been scheduled for Tuesday, February 8, 2005, at 11:00 a.m.  The memorandum briefly recounts

the offense conduct and charges. *See* Part I.  Second, it outlines the procedure to be followed in

sentencings in the wake of *United States v. Booker*, 125 S. Ct. 738 (2005).  *See* Part II.  Third, it

explains why the Presentence Report ("PSR") properly calculates the defendant's sentencing

range under the U.S. Sentencing Guidelines.  *See* Part III.  Fourth, it explains why various factors

do not warrant either a departure from the range specified by the Guidelines in determining the

advisory Guidelines range, or a variance from the advisory Guidelines range when deciding upon

the appropriate sentence in light of the factors outlined in 18 U.S.C. § 3553(a).  *See* Part IV.

I.      **The Offense Conduct and Charges**

The Government agrees with the description of the offense conduct as outlined in the

PSR, and respectfully requests this Court to adopt the factual findings of the PSR.

In brief, the defendant Frank S. Chuang was the sole owner of an engineering firm, L-C

Associates, Inc., which performed significant work under numerous contracts with state

departments of transportation in Connecticut, Massachusetts, New York, and Rhode Island.  The

vast majority of these contracts were 70% to 90% federally funded.  Over the course of several

years, from 1995 to 2003, the defendant fraudulently inflated his billings in all of these contracts.

He achieved this through a number of methods: (1) personally re-writing employee timesheets on

a biweekly basis, by hand, and falsely shifting their reported hours into jobs or overhead

categories that would yield more profit for L-C; (2) adding personal employees (such as his

housekeeper) to the corporate payroll and thereby increasing the overhead rate billed to the

government; and (3) further inflating the overhead billed to the government by withholding

significant information from his accountant.  In connection with these false claims, and as a

result of this prosecution, the defendant ultimately agreed to a civil settlement of $3,400,000

payable to the U.S. Department of Transportation (of which $1,491,246.56 is credited toward

restitution to the federal government). An additional $1,024,473.99 in restitution was due to the

various state departments of transportation.

      Relatedly, the defendant deposited millions of dollars from certain government contracts

into a bank account that he concealed from his own accountant, and further falsified corporate

records in order to lead his accountant to significantly underreport corporate and personal income

on tax returns for the years 1995 through 2000, resulting in total unpaid taxes of about

$1,694,730.00.  Once interest and penalties were added, the defendant faced a total liability to the

IRS of $4,340,949.20.

      All of this wrongdoing was uncovered only after a years-long investigation that was

initiated by auditors of the Connecticut Department of Transportation, and which eventually

grew into a federal grand jury matter involving agents from the U.S. Department of

Transportation and the Internal Revenue Service.

      On September 24, 2003, the defendant pleaded guilty to two counts of a thirty-count

indictment. Each of those counts charged him with submitting false claims to the United States Department of Transportation, through state departments of transportation, in violation of 18 U.S.C. § 287. On that same date, the defendant pleaded guilty to a one-count information charging him with tax evasion in violation of 26 U.S.C. § 7201, in connection with his 1997 federal income tax return.

All told, the defendant's tax evasion and false claims required him to make payments totalling $8,765,423.19 to the various federal and state departments of transportation and the IRS. In compliance with the plea agreement, he has completed all such payments well in advance of sentencing. Sentencing has been continued in this matter numerous times, principally in order to afford the parties time to obtain psychiatric evaluations of the defendant.

## II.    **Sentencing in the Wake of *Booker***

In *United States v. Booker*, 125 S. Ct. 738, 2005 WL 50108 (2005), the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in *Blakely v. Washington*, 124 S. Ct. 2531 (2004). The Court determined that a mandatory system in which a sentence is increased based on factual findings by a judge violates the right to trial by jury. As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus declaring the Guidelines "effectively advisory." *Booker*, 2005 WL 50108, at *16. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." *Id.* at *24.

The Court of Appeals for the Second Circuit has offered some initial guidance to

3

sentencing courts on how to proceed with sentencings in the wake of *Booker*.  In *United States v.*

*Crosby*, No. 03-1675 (2d Cir. Feb. 2, 2005), the Court summarized the impact of *Booker* as

follows:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must
> consider the Guidelines and all of the other factors listed in section 3553(a).
> ***Third, consideration of the Guidelines will normally require determination of***
> ***the applicable Guidelines range,*** or at least identification of the arguably
> applicable ranges, and consideration of applicable policy statements. ***Fourth, the***
> ***sentencing judge should decide, after considering the Guidelines and all the***
> ***other factors set forth in section 3553(a), whether (i) to impose the sentence that***
> ***would have been imposed under the Guidelines, i.e., a sentence within the***
> ***applicable Guidelines range or within permissible departure authority, or (ii) to***
> ***impose a non-Guidelines sentence.*** Fifth, the sentencing judge is entitled to find
> all the facts appropriate for determining either a Guidelines sentence or a non-
> Guidelines sentence.

Slip op. at 24-25 (emphasis added).

In other words, a sentencing now involves two analytic stages: first, a determination of

the applicable Guideline range (including any departures); and second, a determination of

whether in light of the Guidelines and the other factors listed in § 3553(a), there is any reason to

impose a non-Guidelines sentence.

As to Stage One, the applicable Guideline range "is normally to be determined in the

same manner as before *Booker/Fanfan*."  *Id.* at 20; *see id.* at 19.  In limited circumstances,

"precise calculation of the applicable Guidelines range may not be necessary" when a judge

determines that either of two (not necessarily overlapping) ranges applies, and if "the sentencing

judge, having complied with section 3553(a), makes a decision to impose a non-Guidelines

sentence, regardless of which of the two ranges applies."  *Id.* at 21.  Such may be true in cases

involving "complicated matters, for example, determination of monetary loss," or "close

questions . . . as to the precise meaning or application of a policy statement authorizing a

4

departure." *Id.* In general, however, Stage One requires the Court to engage in the familiar process of making factual findings by a preponderance of the evidence, and interpreting and applying the Guidelines to those facts in order to ascertain the appropriate sentencing guidelines range.

As to Stage Two, the judge must consider the guidelines in conjunction with the other factors enumerated in § 3553(a), in order to determine whether there is any reason to deviate from the guideline range indicated in Stage One. These factors include: (1) "the nature and circumstances of the offense and history and characteristics of the defendant"; (2) the need for the sentence to serve various goals of the criminal justice system, including (a) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment," (b) to accomplish specific and general deterrence, (c) to protect the public from the defendant, (d) "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; (3) the kinds of sentences available; (4) the sentencing range set forth in the Guidelines; (5) policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to victims.

Because the Guidelines reflect the Sentencing Commission's considered judgment about all of the factors set forth in § 3553(a), the Supreme Court and the Second Circuit have made it clear that the Guidelines continue to play a central role in a sentencing court's § 3553(a) calculus. Writing for the remedial majority in *Booker*, Justice Breyer explained that sentencing courts, "while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." 2005 WL 50108 at *27. As the Court of Appeals has pointed out,

5

"the excision of the mandatory aspect of the Guidelines does not mean that the Guidelines have been discarded." *Crosby*, slip op. at 18.

> [I] is important to bear in mind that *Booker/Fanfan* and section 3553(a) do more than render the Guidelines a body of casual advice, to be consulted or overlooked at the whim of a sentencing judge. Thus, it would be a mistake to think that, after *Booker/Fanfan*, district judges may return to the sentencing regime that existed before 1987 and exercise unfettered discretion to select any sentence within the applicable statutory maximum and minimum. On the contrary, the Supreme Court expects sentencing judges faithfully to discharge their statutory obligation to "consider" the Guidelines and all of the other factors listed in section 3553(a). We have every confidence that the judges of this Circuit will do so, and that the resulting sentences will continue to substantially reduce unwarranted disparities while now achieving somewhat more individualized justice. In short, there need be no "fear of judging."

*Id.* at 25.

In the vast majority of cases, a sentence within the advisory guideline range will be the most effective way of promoting uniform, fair sentencing throughout the nation in compliance with § 3553(a). This view is shared by Congress and the Supreme Court. As every Supreme Court justice in the various opinions in *Booker* recognized, the Guidelines carry out the express national policy, as articulated by Congress, that sentences be uniform across the country to the extent possible and be based on the offender's actual conduct and history. *See, e.g., Booker*, 2005 WL 50108 at *21 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); *id.* at *19 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); *id.* at *42 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a

6

discretionary sentencing regime, was unquestionably Congress' principal aim."); *id.* at *47

(dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing

disparity."). *See also United States v. Wanning*, No. 4:03-CR-3001-1, slip op. at 6 (D. Neb. Feb.

3, 2005) ("The Guidelines and their ranges were explicitly crafted by the Sentencing Commission

at the direction of Congress to implement the statutory purposes of sentencing.").

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes,

represent the distillation of 15 years of careful study of sentencing practices across the country,

and correlate as well to the varying severity of crimes as defined by Congress.  The Guidelines,

consisting of offense characteristics and various grounds for departure, address all of the

considerations relevant to sentencing, as articulated in 18 U.S.C. § 3553(a), not least of which are

the nature and circumstances of the offense (which are covered thoroughly in Chapters 2 and 3 of

the Guidelines Manual), the history and characteristics of the defendant (which are covered in

Chapter 4 with respect to criminal history and Chapter 5 with respect to departures based on the

most commonly considered personal characteristics), and the need to provide restitution to

victims (Chapter 5, Part E).

Thus, fidelity to the Guidelines best accomplishes the purpose of fair and consistent

sentencing outlined in § 3553(a), and should occur absent truly unusual circumstances.  *See*

*Wanning*, slip op. at 8-9 (concluding that "judges should, in the exercise of their newly minted

discretion, normally follow the Guidelines, and the ranges produced by them, because that

approach represents the best (though an imperfect) method of sentencing").  The government

commends to the Court's attention the scholarly opinions of Judge Cassell in *United States v.*

*Wilson*, 2005 WL 78552 (D. Utah Jan. 13, 2005) ("*Wilson I*"), and No. 2:03-CR-00882 PGC (D.

7

Utah Feb. 2, 2005) ("*Wilson II*"), available at http://www.utd.uscourts.gov/reports/wilson2.pdf, which reach this same conclusion. As Judge Cassell explained, the Guidelines represent the product of an expert commission which has studied the sentencing process at great length, under the specific mandate of Congress to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to accord with legislatively determined policies. *Wilson* further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. Judge Cassell further observed that the Guidelines provide appropriate guidance, which is fully consonant with legislative policy, as to when particular offender characteristics properly factor into the sentencing calculus -- for example, forbidding consideration of factors such as race, religion, or socioeconomic status, and assigning only modest weight to factors such as family ties, age, and civic contributions. *Wilson II*, slip op. at 17. Importantly, Judge Cassell properly concluded that one of the primary goals of the criminal sentencing system is "equal justice under the law -- with a sentencing statute that mandates similar outcomes for similar crimes committed by similar offenders." *Id.* at 31. "The only realistic way to insure this is to follow generally the Guidelines." *Id.* For all of these reasons, a court should "give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." *Wilson I*, at *1.

 Accordingly, a sentence within the guideline range is presumptively reasonable, and

accommodates the congressional purpose set forth in § 3553(a), affirmed by the Supreme Court, of obtaining fair sentences which are uniform to the extent possible.  The government anticipates that only sentences outside the guideline range will be subject to appellate scrutiny for reasonableness in light of the Congressional mandate, absent truly extraordinary circumstances.

As explained below, this case does not present the rare case in which the Guidelines (including the rules governing departures) fail to produce a sentencing range that fully accords with the various factors set forth in § 3553(a).  Therefore, the government respectfully recommends that the Court sentence the defendant within the Guidelines range calculated in the PSR.

### III.   The PSR Properly Calculated the Defendant's Guidelines Sentencing Range at 41-51 Months of Imprisonment.

The Government agrees with the PSR's calculation of the defendant's guidelines, and contends that no downward departures (with one exception noted below, with respect to a fine) or variances from the appropriate Guideline range are appropriate.[1]

More specifically, the dollar amounts of the tax and fraud losses should be aggregated into a single group pursuant to U.S.S.G. § 3D1.2(d) and *United States v. Gordon*, 291 F.3d 181 (2d Cir. 2002), yielding a total loss of $4,210,450.55.  Pursuant to U.S.S.G. § 3D1.3(b), the total offense level is then calculated by using the guidelines yielding the highest offense level when applied to this loss amount–in this case, the tax guidelines of U.S.S.G. §§ 2T1.1 and 2T4.1, which yields a base offense level 21 because the total loss is between $2,500,000 and $5,000,000.  Two levels should be added because the offense involved the defendant's failure to

---

[1]Because the offenses occurred prior to November 1, 2001, the Court should use the Guidelines Manual in effect on that date to avoid Ex Post Facto concerns.

report or to correctly identify the source of income exceeding $10,000 in any year from criminal activity pursuant to U.S.S.G. § 2T1.1(b)(1). Two further levels should be added because the offense involved sophisticated concealment pursuant to U.S.S.G. § 2T1.1(b)(2), resulting in an offense level of 25. Assuming no further enhancements or reductions apply, defendant's adjusted offense level is level 25, which is reduced by three levels for acceptance of responsibility, resulting in a total offense level of 22. There is no dispute that the defendant falls within Criminal History Category I. This yields a sentencing range of 41-51 months of imprisonment, a $7,500 to $75,000 fine, and 2-3 years of supervised release. *See* PSR ¶¶72-82.

As the Government stated in the plea agreement, it does not oppose a request for a downward departure from the fine range in light of the defendant's $3.4 million civil settlement with the U.S. Department of Transportation, of which approximately $1.9 million represented payments in excess of the restitution due to the federal government as a result of his false claims.

Based on positions adopted by the defendant in the plea agreement, and on subsequent discussions with defense counsel, the Government anticipates that the defendant will raise several objections to the PSR's calculations of his offense level for sentencing purposes. First, he may argue that his tax and fraud offenses should be grouped pursuant to subsection (c) of U.S.S.G. § 3D1.2, rather than subsection (d). Second, he may argue that the Court should not impose a two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(1) based on his failure to report income in excess of $10,000 in a single year which he had derived from his false claims scheme. Third, he may contend that he did not engage in "sophisticated concealment" of his crime, yielding a two-level enhancement pursuant to U.S.S.G. § 2T1.1(b)(2). As explained below, the defendant's first claim is definitively foreclosed by *United States v. Gordon*, 291 F.3d

10

181 (2d Cir. 2002), *cert. denied*, 537 U.S. 1114 (2003), and his second and third claims are

factually unfounded.  *See* Parts III.A-C.

A.     **The PSR Properly Grouped the Defendant's False Claims and Tax Offenses Under U.S.S.G. § 3D1.2(d)**

The Probation Office has correctly recommended that the defendant's false claims and tax

offenses be grouped under U.S.S.G. § 3D1.2(d), yielding an aggregate loss of $4,210,450.55.

The United States Sentencing Guidelines prescribe certain "grouping" rules to govern the manner

in which a sentencing court should calculate an offense level in cases where a defendant is

convicted on more than one count.  *See* U.S.S.G. §§ 3D1.1-3D1.5.  A sentencing court's initial

inquiry is whether multiple counts involve "substantially the same harm" and should therefore be

"grouped" – that is, consolidated into a single group of closely related counts.  *See* § 3D1.2.  If

the district court determines that the multiple counts involve "substantially the same harm," then

the multiple counts are consolidated into a single group, and no additional increase in offense

level results from the fact that there were multiple counts of conviction (except to the extent that

the offense level for the single group may be calculated on the basis of the aggregate harm

resulting from all of the counts of conviction and relevant offense conduct).  *See* § 3D1.3.

Section 3D1.2 of the Sentencing Guidelines identifies four situations where multiple

counts are presumed to involve substantially the same harm:

> (a)     When counts involve the same victim and the same act or transaction.
>
> (b)     When counts involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.
>
> (c)     When one of the counts embodies conduct that is treated as a

11

specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts.

(d)     When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.

Offenses covered by the following guidelines are to be grouped under this subsection:

§§ 2B1.1, 2B1.4, 2B1.5, 2B4.1, 2B5.1, 2B5.3, 2B6.1;
§§ 2C1.1, 2C1.2, 2C1.7, 2C1.8;
§§ 2D1.1, 2D1.2, 2D1.5, 2D1.11, 2D1.13;
§§ 2E4.1, 2E5.1;
§§ 2G2.2, 2G2.4;
§ 2K2.1;
§§ 2L1.1, 2L2.1;

U.S.S.G. § 3D1.2(a)-(d).

The Court of Appeals for the Second Circuit has squarely held that fraud and tax charges should be grouped pursuant to § 3D1.2(d), meaning that the dollar amounts of loss for each crime should be aggregated, and the sentencing court should adopt the highest offense level yielded by calculating the tax and fraud guidelines. *See Gordon*, 291 F.3d at 192-93 (holding that grouping under § 3D1.2(d) was mandatory for mail fraud and tax evasion charges, and reversing district court's grouping under § 3D1.2(c)); *see also United States v. Petrillo*, 237 F.3d 119, 125 (2d Cir. 2000) (grouping required for fraud and tax evasion counts because "both tax evasion and mail fraud follow offense level schedules that trigger substantially identical offense level increments based on the amount of loss" and "the offenses here were both frauds, were part of a single continuous course of criminal activity and involved the same funds"); *United States v. Fitzgerald*, 232 F.3d 315, 319-20 (2d Cir. 2000) (grouping required for certain related fraud,

12

conversion, and tax evasion counts, all stemming from the defendant's misappropriation of money from a union welfare fund).

The defendant may argue, in part, that the tax and fraud charges should be grouped pursuant to § 3D1.2(c), on the grounds that the contract fraud "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another of the counts"–namely, the defendant's failure to report income exceeding $10,000 in any year from criminal activity, which yields a two-level enhancement under § 2T1.1(b)(1).  In his concurring opinion in *Gordon*, Judge Newman acknowledged that this argument had some persuasive force, but he ultimately concurred with Judges Oakes and Parker that grouping under § 3D1.2(d) is mandatory, absent an amendment to the Sentencing Guidelines.  *See Gordon*, 291 F.3d at 198 (agreeing that until Sentencing Commission takes a clear position, "we should continue to follow *Fitzgerald* and *Petrillo*, despite the arguable basis for distinguishing them, and group mail fraud and tax fraud offenses under subsection (d)").  Accordingly, *Gordon* mandates grouping under § 3D1.2(d).

### B.     The PSR Properly Concluded that the Defendant Failed To Report More Than $10,000 in a Single Year from Criminal Activity, Pursuant to U.S.S.G. § 2T1.1(b)(1)

The PSR properly added two levels to the defendant's base offense level pursuant to U.S.S.G. § 2T1.1(b)(1), based on the defendant's failure to report more than $10,000 in a single year that was derived from criminal activity.  More specifically, the defendant overbilled prime contractors (and ultimately state and federal departments of transportation) on lump-sum contracts by inflating his overhead costs.  He then deposited the proceeds of this fraudulent scheme to a bank account at the Glastonbury Bank & Trust, the existence of which he concealed

from both his internal bookkeepers and outside accountant.  As a result, the defendant failed to report these overbillings as income on either his personal tax returns or L-C's corporate tax returns.

One example illustrates this fact.  From 1995 through 1998, the defendant fraudulently inflated his corporation's overhead through the various methods set forth above.  Throughout this period, he submitted a series of bills to the Heery Corp., which was serving as a prime contractor for a federally funded transportation project.  On this contract, denominated L-C Contract No. 94-126, the defendant overbilled the following amounts each year:

| Year | Inflated Overhead |
|------|-------------------|
| 1995 | $14,506.77 |
| 1996 | $20,916.07 |
| 1997 | $33,553.15 |
| 1998 | $20,043.74 |

The defendant diverted all of these fraud proceeds to his secret bank account, and failed to report any of these funds on any tax returns.  Because the defendant clearly failed to report more than $10,000 in a single year that was derived from criminal activity, the § 2T1.1(b)(1) enhancement unquestionably applies.

Moreover, to the extent the defendant argues that application of U.S.S.G. § 2T1.1(b)(1) effectively results in "double-counting" on the notion that nearly all the dollar losses derived from his tax and false claims schemes were derived from the defendant's concealment of the lump-sum jobs from his accountant, such a claim would be factually unfounded.  As a detailed audit of the offense conduct revealed, approximately 36% of the fraud losses from 1995 through

14

2000, amounting to more than $500,000, was derived from the shifting of costs from lump-sum jobs into overhead categories, and from the inclusion of unrelated personnel in L-C's payroll and overhead.  *See* Attachment A (spreadsheets).

### C.    The PSR Properly Added a Two-Level Enhancement on the Grounds that the Defendant Engaged in Sophisticated Concealment

The PSR correctly added a two-level enhancement under § 2T1.1(b)(2) based on the defendant's use of sophisticated means to conceal his offense conduct.  Specifically, the defendant maintained a separate bank account into which he deposited proceeds of specified lump-sum contracts; concealed the existence of this bank account from the accountant who prepared his tax returns; carefully redacted job summaries which were provided to the accountant in order to fraudulently result in vast overstatement of his overhead rate; and meticulously tracked his biweekly, handwritten falsification of every field employee's timesheet, so that he could secretly track how many hours each employee had actually worked on relevant jobs, as opposed to the allocations he had falsely recorded in contract billings and other corporate records.  (In this regard, for example, the court-authorized search of L-C offices uncovered a spreadsheet in the defendant's handwriting which listed the number of hours each of his engineers and other employees had worked on a particular job -- and these hours corresponded perfectly to original unaltered employee timesheets that were located during the investigation, and which starkly contradicted the altered timesheets created by the defendant as the basis for his fraudulent billings.)  The defendant took advantage of his sophisticated understanding of complex burden, fringe, and overhead ("BF&O") rates, as well as of which contracts would yield higher profits if overbilled, in accomplishing his fraudulent schemes.

15

The methods employed by the defendant to execute and conceal his scheme have been recognized by the courts as constituting "sophisticated means" within the definition adopted by the Guidelines. Falsification of corporate records is a relevant factor in this regard. *See United States v. Middlemiss*, 217 F.3d 112, 124 (2d Cir. 2000) (upholding sophisticated means enhancement under U.S.S.G. § 2T1.1(b)(2), where defendant engaged in "sophisticated scheme" to conceal interests, "created an extensive false paper trail of corporate documents, and accepted only cash payments to evade detection and taxation"); *United States v. Wu*, 81 F.3d 72, 73-74 (7th Cir. 1996) (upholding sophisticated means enhancement in tax prosecution in part because defendants meticulously falsified corporate records over seven-year period). Because the defendant engaged in a sustained and elaborate manipulation of his corporate records over a period of years, the two-level enhancement for sophisticated means is appropriate.

## IV.    Other Considerations Do Not Warrant Downward Departures That Yield a Lower Advisory Guideline Range, Nor Imposition of a Sentence that Varies from That Range.

The defendant may present further arguments in favor of a sentence more lenient than the one dictated by the Guidelines, framing such inquiry either in terms of downward departures pursuant to U.S.S.G. § 5K2.0 and § 5K2.13, or in terms of factors under 18 U.S.C. § 3553(a) that would make such leniency more "reasonable" than a sentence within the advisory Guideline range. Such arguments may include mental impairment, charitable/civic activities, economic loss suffered by the defendant, and extraordinary acceptance of responsibility based on early payment of restitution. As discussed at length below, none of these factors warrants a downward departure for purposes of determining the advisory guideline range, nor do they justify a deviation from the advisory range in light of the factors enumerated in § 3553(a).

16

**A.    The Defendant Does Not Qualify for a Downward Departure or a Variance from the Advisory Guideline Range Based on His Mental Condition.**

The Guidelines authorize a downward departure "if the defendant committed the offense while suffering from a significantly reduced mental capacity."  U.S.S.G. § 5K2.13 (1998).  The application note to this guideline defines a "significantly reduced mental capacity" as "a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."  To be eligible for such a departure, a defendant must prove by a preponderance of the evidence "that he suffers from 'reduced mental capacity' and that a 'causal link [exists] between that reduced capacity and the commission of the charged offense.'"  *United States v. Ventrilla*, 233 F.3d 166, 169 (2d Cir. 2000) (per curiam) (quoting *United States v. Prescott*, 920 F.2d 139, 146 (2d Cir.1990)); *United States v. Piervinanzi*, 23 F.3d 670, 684 (2d Cir. 1994).

The defendant must do more than simply establish that he had an innate distrust of the government, or even that he suffered from a delusional disorder .  He also must prove that any disorder resulted in a *significantly reduced cognitive or volitional capacity*. Furthermore, he must show by a preponderance of the evidence that any reduced capacity *caused* his crime.

The Court has the benefit of two psychiatric reports, prepared by Dr. Catherine Lewis (at the request of the government), and Dr. James Black (at the request of the defendant), together with a recently submitted rebuttal letter by Dr. Black, each attached as a separate addendum to the PSR.

Dr. Lewis' s extensive report was based not only on an interview with the defendant, but on numerous collateral sources.  Among other things, Dr. Lewis considered the charging

17

documents, the plea agreement, the detailed stipulation of offense conduct, the even more

detailed Government's version of the offense conduct, samples of various documents altered by

the defendant, office memos circulated by the defendant, information from various employee

interviews, depositions from the defendant and two employees in a sexual harassment suit

against the defendant, letters submitted by numerous personal acquaintances on behalf of the

defendant, and Dr. Black's report.  Among other things, Dr. Lewis reviewed the defendant's

family, educational, and employment history, including his upbringing in Taiwan, adversity

suffered under the Japanese occupation, his successful attainment of academic degrees in Taiwan

and the United States, and his development of a successful engineering business in Connecticut.

Dr. Lewis evaluated the defendant's appearance and behavior; his cooperation; his mood

and affect, his speech, his thought content and process; and his cognitive functioning.  Based on

her comprehensive evaluation, Dr. Lewis concluded that the defendant "meets criteria for Major

Depression, Single Episode, Moderate, based on symptoms that included depressed mood,

decreased appetite, insomnia, loss of energy, feelings of worthlessness, passive thoughts of

suicide, and poor concentration.  Significantly, "[n]one of these symptoms were present before

Mr. Chuang's arrest," *id.* at 7, and his depressive disorder "had its onset after his arrest," *id.* at 7.

Dr. Lewis saw no evidence of a personality disorder or psychotic disorder in the

defendant.  As Dr. Lewis explained, "[a] personality disorder is characterized by an enduring

pattern of inner experience and behavior that deviates markedly from the expectations of the

individual's culture," and "is manifested in two or more of the following areas: cognition,

affectivity, interpersonal functioning, and impulse control."  *Id.*  He is a socially active man with

many friends, a long-term marriage, and good family relationships.  His worries that his

18

difficulties are related to him being Chinese are not evidence of psychosis (i.e., delusions), nor do they justify a diagnosis of a personality disorder. In short, the defendant "was functioning at his full mental capacity" at the time of the offense conduct and "did not have a psychiatric disorder that in any way impaired his ability to appreciate the wrongfulness of the behavior comprising the offense or to exercise the power of reason and had no psychiatric disorder that in any way impaired his ability to control behavior he knew was wrongful." *Id.*

Dr. Black's report acknowledged the depressive symptoms, but further diagnosed the defendant as having a Paranoid Personality Disorder and a Delusional Disorder. PSR, 1st Add at 1. In Dr. Black's opinion, this disorder apparently arose mainly from the defendant's early life in Taiwan under oppressive government regimes. Furthermore, Dr. Black appears to have concluded that only the existence of a psychiatric disorder can reconcile the defendant's illegal actions with his religious convictions, an otherwise affable personality, and a supposed belief that his conduct was in fact legal. As discussed below, each of these conclusions suffers from serious flaws.

First, Dr. Black's diagnosis is based on erroneous factual assumptions regarding the nature of the offense conduct and the defendant's interpersonal relations -- a critical flaw, given that his task was to determine to what extent a psychiatric disorder might have caused that conduct. It appears from recently disclosed treatment notes that Dr. Black based his conclusions on nothing more than four interviews with the defendant, an interview with the defendant's wife, and interviews with the defendant's attorneys. There is no indication in his reports that he reviewed the collateral materials which were considered by Dr. Lewis (and which were disclosed to the defense in that connection).

For example, Dr. Black reports the defendant's self-serving statement that he kept the unaltered timesheets in the same box as the altered timesheets, and assumed that his accountant would understand the practice. He further relates that "it was Dr. Chuang's opinion that he was not acting dishonestly and sincerely believed he had the right to engage in" his conduct of altering timesheets. *Id.* at 2. This dissonance between the dishonesty of the defendant's actions on the one hand, and his supposed perceptions that they were not dishonest on the other, prompted Dr. Black to conclude that the defendant suffered from a Delusional Disorder. Presumably, however, Dr. Black's conclusion would have been different had he been informed of behavior *undertaken by the defendant at the time of the offense to conceal his illegal fraud but not to hide his licit activities*-- that is, behavior that revealed a contemporaneous appreciation of the wrongfulness of his offense conduct. For example, interviews of L-C employees disclosed that the defendant *forbade access* by his accountant to certain filekeeping areas, including those areas which included the original unaltered timesheets -- but not necessarily from other areas which did not contain such evidence. Moreover, after the initial audit by the State of Connecticut uncovered certain timesheet irregularities, a number of L-C employees noticed that copies of their original timesheets which had been stored in their desks -- but not all of their documents -- mysteriously vanished. The original, unaltered timesheets which had been kept in an off-limits area likewise vanished after the audit, while the majority of L-C corporate records remained in place. Moreover, the defendant *redacted* job schedules that were prepared by his bookkeeper for his accountant, so that significant portions of business expenses would not be attributed to lump-sum jobs and would instead be incorporated into overhead. Not all information regarding jobs was withheld from the accountant -- just the information that would lead to inflated billings and

tax evasion. And not all bank accounts were concealed from the accountant -- only the one into which the defendant deposited proceeds from lump-sum contracts that he was hiding from the accountant. These and other actions evince a clear consciousness of guilt -- a conclusion that undercuts the central premise of Dr. Black's diagnosis, namely that the defendant did not appreciate the wrongfulness of his conduct at the time.

Puzzling over a similar disconnect between "the praise lauded upon [the defendant] by his employees, and his sometimes, accusatory statements rendered in his memos," Dr. Black likewise concluded that this supposed "conflict in behavior" could be "plausibly expl[ained]" only by a psychiatric order. PSR 3d Add. at 2. Disregarding Occam's Razor that the simplest answer is usually the correct answer, Dr. Black apparently failed to consider the obvious possibility that he was simply working from incorrect factual premises. Dr. Black seems to have accepted uncritically that letters written by a handful of employees to the probation office on behalf of the defense presented a complete and unbiased view of the defendant's interpersonal relationships. Again, Dr. Black seems to have been unaware that many of the defendant's employees in fact did *not* regard him as a "laud[able]" person -- even though this information was disclosed to the defense in connection with Dr. Lewis's report. Dr. Black's report makes no mention of one former employee's detailed accusations that the defendant sexually harassed her; or the statements of various other employees that the defendant was "very demanding and pushy," that he "was mean to everyone" except the victim of his sexual advances, that he used to make an employee "cry often," that the defendant "yelled at everyone," that he permitted "no socializing at all" and ran a "sweatshop," and that the defendant "exploited his labor" and did not always pay his employees for the full day's hours or for overtime. *See* Attachment B (excerpts

21

from interview reports with witness names redacted, which were disclosed to defense with identifying information included). From a business perspective, such conduct (except for the sexual harassment) may or may not be justifiable -- but it certainly undercuts Dr. Black's rose-colored assumption that the defendant had a "usual pleasant, cooperative and engaging personality," *id.* at 2, and that the mismatch between that supposedly lovely demeanor and his offense conduct could only be explained by psychosis.

Second, the bulk of Dr. Black's report is devoted to the notion that the defendant's formative experiences as a Taiwanese citizen living under oppressive conditions naturally imbued him with a Taiwanese-wide "cultural paranoia," *id.* at 5, that warrants a psychiatric diagnosis. The most obvious doubt suggested by such a broad-brush "diagnosis" -- for which, incidentally, Dr. Black cites no diagnostic criteria, from the DSM-IV or elsewhere -- is that it implicitly suggests that all Taiwanese immigrants of the defendant's generation would be equally prone to paranoid and delusional behavior, if not outright thievery from their fellow citizens. But even if such a remarkable proposition were accepted *arguendo*, his diagnosis overlooks the psychiatric definition, which Dr. Lewis points out, of a personality disorder as "an enduring pattern of inner experience and behavior *that deviates markedly from the expectations of the individual's culture*." PSR 2d Add. at 7 (emphasis added). Instead of addressing why his diagnosis does not conform to this generally accepted standard for identifying a psychiatric disorder and explaining why a supposedly shared cultural trait can support an individualized diagnosis of psychosis, Dr. Black limits his response to the odd claim that Dr. Lewis is simply "too young" to understand the relevant phenomenon. PSR 3d Add at 2. The short of the matter is that even if Taiwanese citizens who suffered under the Japanese occupation retain a cultural

22

tendency to harbor a deep and abiding suspicion of government, they are not for that reason deemed psychotic.

Third, Dr. Black cites "the contrast, and even conflict between Dr. Chuang's religious convictions . . . and his alleged illegal behavior" as support for the notion that the defendant must suffer from a psychiatric disorder. *Id.* Although in an ideal world one might hope that sincerely religious people would never commit crimes, the sad truth is that the prisons are full of aspiring saints and sinners alike. The spirit may be willing, but the flesh is weak.

Finally, even if one accepts Dr. Black's notion that the defendant suffers from a delusional disorder that the *government* is out to get *him*, that does nothing to explain why *the defendant* decided to get the *government*. Put in the terms of the Guidelines, Dr. Black does not offer any causal link between Mr. Chuang's supposed delusions and the affirmative steps he undertook to defraud the United States and to cheat on his taxes. The Seventh Circuit has offered useful instruction with respect to the causal connection that must be established between a volitional impairment and the offense conduct, explaining that "an impairment that provides a motive is insufficient under § 5K2.13." *United States v. Roach*, 296 F.3d 565, 569 (7th Cir. 2002). In that case, the defendant was convicted of submitting false expense reports, and was granted a downward departure under § 5K2.13 based on her claim that she stole money to feed a compulsive shopping disorder. *Id.* at 568-69. The Court of Appeals reversed, holding that a departure was not warranted by a finding that the defendant "would not have committed the offense had it not been for her shopping disorder." *Id.* at 570.

> Roach's compulsive shopping may well have been a necessary cause of her offense and even, in the district court's words, the "driving force" behind it. But like motive, this finding reveals nothing about Roach's mental capacity when she committed the fraud,

and therefore does not establish diminished capacity for purposes of § 5K2.13.

*Id.* at 570-71.

As in *Roach*, the defendant in the present case has at most suggested that he distrusted the Government – that is, that he had a motive (whether or not rational) to hide his assets from the Government. There was no evidence that he was unable to control his urges to *steal* from the Government, whether by altering his employees' timesheets on a weekly basis, carefully re-allocating hours among jobs and among labor categories in such a way to increase his reimbursement on government-funded contracts; by destroying nearly all of the employees' original, unaltered timesheets when the Connecticut Department of Transportation began auditing L-C's billings; by directing that his household workers and employees of his and his wife's real-estate companies be paid out of the L-C payroll; by directing his bookkeepers to remove any mention of particular contracts from job schedules that would be turned over to the corporate auditors who prepared annual financial statements as well as tax returns; by meticulously precluding all access by his auditors and employees to corporate records that would reveal billings attributable to lump-sum contracts, the proceeds of which were diverted to a separate corporate bank account.

Absent any cognitive or volitional impairment that contributed to his offense conduct, there is nothing about the defendant's mental condition that warrants either a downward departure or a variance from the advisory guidelines range. To the contrary, the "history and characteristics" of this defendant, 18 U.S.C. § 3553(a)(1), demonstrate that a guidelines sentence is eminently appropriate. By his own account, the defendant escaped oppression in Taiwan to enjoy freedom, citizenship, and resounding economic success in the United States. Moreover,

that economic success was due in large part to lucrative *government-funded* contracts obtained by his engineering firm, and in particular due to minority set-aside programs under which the United States *favored* him because of his national origin.  The defendant responded to the generosity of his new home country by bilking his fellow taxpayers of millions of dollars.  He should be sentenced accordingly.

**B.      The Defendant Does Not Qualify for a Downward Departure or a Variance from the Advisory Guideline Range Based on His Charitable Works**

The defendant may also move for a downward departure or other form of variance from an advisory guideline range based on his charitable works.  There is no reason to doubt the sincerity of the defendant's financial contributions to charities, primarily to his church.  Yet these activities are not exceptional for a person of the defendant's socioeconomic status -- particularly when one realizes that he stole far more than he gave away.

The Sentencing Guidelines make expressly clear that  "[m]ilitary, civic, charitable, or public service . . . and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  U.S.S.G. § 5H1.11.  A "good works" departure is a "discouraged basis for departure."  *United States v. Gaines*, 295 F.3d 293, 303 (2d Cir. 2002).  Only if a defendant's conduct was so extraordinary that it falls outside of the heartland of cases covered by the guidelines is a downward departure warranted.  *See Koon v. United States*, 518 U.S. 81, 95 (1996); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996); *Gaines*, 295 F.3d at 303; U.S.S.G. ch. 5, pt. H, introductory cmt. (departures based on discouraged factors should occur only "in exceptional cases").

The policy against downward departures based on charitable contributions is sensibly

25

grounded in part on the notion that affluent defendants should not receive more favorable

treatment than disadvantaged defendants, based on their ability to donate money to charitable

causes. As the Fourth Circuit explained in *United States v. McHan*, 920 F.2d 244, 248 (4th

Cir.1990), in reversing a downward departure on charitable and civic contributions:

> It would be ironic if the judicial system were to reward [a defendant] with a lower
> sentence because he was a successful [criminal] rather than an unsuccessful one.
> Such an approach to sentencing would create perverse incentives for those
> involved in criminal enterprises. Moreover, to allow any affluent offender to point
> to the good his money has performed and to receive a downward departure from
> the calculated offense level on that basis is to make a mockery of the Guidelines.
> Such accommodation suggests that a successful criminal defendant need only
> write out a few checks to charities and then indignantly demand that his sentence
> be reduced. The very idea of such purchases of lower sentences is unsavory, and
> suggests that society can always be bought off, even by those whose criminal
> misconduct has shown contempt for its well-being.

Particularly in the case of affluent businesspeople convicted of white-collar crimes, civic

and charitable works are the expectation, not the exception, and accordingly will rarely merit a

downward departure. For example, in facts quite similar to the case at bar, the First Circuit

reversed a downward departure based on charitable works, where the white-collar defendant was

"a member of a church, tithe[d] ten percent of his income, and devote[d] hours every week to

unpaid service with the church in a variety of positions," and had taken family members and

others into his home. *United States v. Thurston*, 358 F.3d 51, 79 (1st Cir. 2004), *vacated and*

*remanded for reconsideration in light of Booker,* 72 U.S.L.W. 3769 (Jan. 24, 2005). That Court

held that the businessman's charitable works were "hardly surprising" in light of his position as a

prominent corporate executive, and hence difficult to categorize as "exceptional" for purposes of

a downward departure. *Id.* at 80. Affluent white-collar defendants are understandably "better

situated to make large financial contributions than someone for whom the expenses of day-to-day

26

life are more pressing; indeed, business leaders are often expected, by virtue of their positions, to

engage in civic and charitable activities. Those who donate large sums because they can should

not gain an advantage over those who do not make such donations because they cannot." *Id.*

Other circuits have reached similar conclusions. In *United States v. Morken*, 133 F.3d

628, 629-30 (8th Cir.1998), the Eighth Circuit reversed a downward departure for a white-collar

defendant whose good works were not exceptional in light of his income and preeminence in

small town. "'[I]t is *usual* and *ordinary,* in the prosecution of similar white collar crimes

involving high- ranking corporate executives . . . to find that a defendant was involved as a leader

in community charities, civic organizations, and church efforts.'" *United States v. McClatchey*,

316 F.3d 1122, 1135 (10th Cir. 2003) (reversing aberrant behavior departure for executive

involved in defrauding Medicare) (quoting *United States v. Kohlbach*, 38 F.3d 832, 838-39 (6th

Cir.1994)); *United States v. Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) (reversing downward

departure; "It would appear that high-level business executives, those who are in a position to

commit Sherman Act violations, also enjoy sufficient income and community status so that they

have the opportunities to engage in charitable and benevolent activities.").

In the present case, a downward departure is also unwarranted for the simple fact that the

defendant stole far more than he gave away. At the same time that the defendant was giving

away *thousands* of dollars in charity to local church groups and other charities, he was stealing

*millions* from his fellow citizens by vastly overbilling state and federal Departments of

Transportation and by lying to the Internal Revenue Service about his tax liabilities. The

following chart reveals how the defendant pocketed far, far more through his criminal activity

than he distributed in apparent largesse:

27

| Year | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 |
|------|------|------|------|------|------|------|
| **Unpaid taxes** | 276,072 | 338,183 | 373,444 | 284,363 | 155,453 | 267,215 |
| **Fraudulent overbillings** | 323,442 | 488,770 | 416,163 | 238,247 | 386,089 | 771,909 |
| **Reported charitable giving[3]** | 3,550 | 7,695 | 11,680 | 50,920 | 7,133 | 46,840 |
| **Supplemental charitable giving discovered upon examination of defendant's financial records[4]** | 0 | 900 | 500 | 5,000 | 7,540 | 0 |

In light of the gulf between the sums purloined by the defendant and the sums he disbursed as charity, any downward departure for charitable works is unwarranted. Likewise, such cramped "generosity" should not be regarded as a "characteristic" of the defendant, 18 U.S.C. § 3553(a)(1), that warrants a sentence more lenient than the one dictated by the Guidelines.

C.     **The Defendant's Prompt Payment of Full Restitution Does Not Warrant a Downward Departure or Variance from the Advisory Guideline Range, But May Properly Be Considered in Choosing a Sentence Within the Appropriate Guideline Range.**

As noted in Part I above, the defendant has fully complied with the terms of the plea agreement, paying a total of approximately $8.7 million in a civil settlement, restitution, taxes,

---

[3]These reflect amounts reported on the defendant's Forms 1040 personal income tax returns, and include any contributions claimed to have been made by either of the L-C corporations, since those amounts were reflected on the corporate Schedules K-1 and therefore flowed through to the defendant's Forms 1040.

[4]These additional amounts, paid out of the Glastonbury Bank & Trust account, were credited to the defendant as charitable contributions for purposes of calculating his corrected tax obligations in connection with the present plea agreement.

interest, and penalties.  This sum also includes taxes, interest, and penalties attributable to false

tax returns filed on behalf of the defendant's wife and son, for which the defendant promptly

accepted personal responsibility.  The Court should enter an order of restitution which recognizes

the mandatory nature of the payments made by the defendant, and recognizing that such

restitution has already been satisfactorily made.

The Court may properly take account of the defendant's prompt and complete payment of

restitution when determining at what point within the appropriate guideline range to impose a

sentence.  Furthermore, the Government does not oppose a downward departure from the

relevant *fine* range to account for the significant financial recovery it has obtained.

It would be inappropriate, however, to otherwise depart downward or to deviate from the

advisory guideline range on such grounds.  Restitution is generally considered a factor in

determining whether a defendant qualifies for a reduction in offense level under the acceptance

of responsibility guideline, § 3E1.1.  *See also id.*, app. note 1(c) (explaining that court may

consider "voluntary payment of restitution prior to adjudication of guilt" in determining

acceptance of responsibility).  It is true that "restitution . . . can provide a basis for a departure

when present to such an exceptional degree that it cannot be characterized as typical or 'usual.'"

*United States v. Hairston*, 96 F.3d 102, 108-09 (4th Cir. 1996).  When a defendant makes such

restitution only *after* his wrongdoing has been detected and he faces criminal charges, however, a

departure is not called for.  *Id.* (reversing downward departure where embezzler did not make

restitution "until after she had been criminally indicted, in order to settle her civil liability, and in

the hope of receiving a reduced sentence").  As in *Hairston*, the defendant's payments in excess

of the false claims were made primarily in satisfaction of his liability for civil penalties -- here,

29

under the False Claims Act.  Section 3553(a) instructs a court to fashion a sentence that achieves,

among other things, the provision of restitution to all victims of the offense conduct.  *See* 18

U.S.C. § 3553(a)(7).  That purpose is satisfied by entering an order of restitution.  Restitution,

whether pre- or post-sentencing, does not satisfy the other goals set forth in § 3553(a), including

just punishment, general or specific deterrence, or incapacitation.  A sentence within the advisory

guideline range would serve those goals and is therefore appropriate.

> **D.**     **The Economic Losses Suffered by the Defendant Flowed Directly From His**
> **Own Fraudulent Conduct, and Do Not Warrant Either a Downward**
> **Departure or Variance from the Advisory Guideline Range.**

As a result of the defendant's years of fraudulent overbilling, he is permanently debarred

from obtaining any federally funded transportation contracts.  Moreover, in conjunction with the

defendant's agreement to plead guilty and to divest himself of L-C, the Government agreed to

dismiss all charges against L-C at the time of sentencing.  *See* Attachment C.  Subsequent to the

plea, the defendant represented to the United States that L-C would be winding down operations,

and requested that charges be dropped in advance of sentencing so that a federal suspension

imposed against L-C could be lifted, in order to facilitate the transfer of remaining contracts to

other engineering firms.  The Government agreed, on the condition that each state department of

transportation had the right to approve or reject the transfer of any contract to particular

companies, including an engineering company named Garg Consulting, which is owned by the

defendant's son.  *See* Attachment D.  Based on discussions with defense counsel, the

Government anticipates that the defendant's sentencing memo will outline the status of his

compliance with these agreements.

The demise of the defendant's wholly-owned engineering business provides no basis for a

downward departure, nor would it justify any variance from the advisory guideline sentence. "[I]t is not unusual that a business built in significant part on fraud will suffer once the fraud stops." *Kohlbach*, 38 F.3d at 836 n.5; *id.* at 836 (reversing downward departure where white-collar defendant had "had lost his equity interest in the multi-million-dollar business that he had built; had been forced to resign as director of a bank, suffering both embarrassment and the loss of director's fees; had been compelled to give up other prominent positions of communal leadership; and had suffered the anguish of seeing his name deeply tarnished in a community where his reputation had once been sterling"). Moreover, the defendant deserves reproach rather than sympathy for the demise of L-C. It was his greed that undid an otherwise profitable business, and which has led to so many innocent employees losing their employment at L-C. In a way, those employees are just as much victims of the defendant's fraud as are the governmental agencies that were overbilled. Responsibility for their loss of livelihood falls solely on his shoulders, and he deserves no leniency for having destroyed his own company.

## V.   **Conclusion**

The defendant carefully engaged in a pattern of criminal conduct over the course of several years, through which he defrauded his fellow citizens of millions of dollars, and which required years of investigation to unravel. "By serving a sentence within the range prescribed by the guidelines, he will do no more than pay an outstanding debt, one that he owes the society that

gave him the opportunity to achieve success." *Kohlbach*, 38 F.3d at 839.

<div style="margin-left:40%">

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

</div>

By:    JAMES G. GENCO
        ASSISTANT U.S. ATTORNEY
        Federal Bar No. ct00360
For:   WILLIAM J. NARDINI
        ASSISTANT U.S. ATTORNEY
        Federal Bar No. CT16012
        157 Church Street, 23rd Floor
        New Haven, CT  06510
        Tel.: (203) 821-3748
        Fax: (203) 773-5378
        william.nardini@usdoj.gov

<div style="text-align:center"><u>CERTIFICATE OF SERVICE</u></div>

I hereby certify that on this 4th day of February, 2005, a true and correct copy of the foregoing Motion was served via fax upon defense counsel:

| | |
|---|---|
| <u>Via Facsimile</u>: (860) 724-3921 | <u>Via Facsimile</u>: (860) 275-8299 |
| Austin J. McGuigan, Esq. | James Wade, Esq. |
| Rome McGuigan Sabanosh PC | Robinson & Cole LLP |
| One State Street | One Commercial Plaza |
| Hartford, CT 06103-3101 | 280 Trumbull Street |
| | Hartford, Ct 06103-3597 |

By:   _____
       JAMES G. GENCO
       Assistant U.S. Attorney
For:  WILLIAM J. NARDINI
       Assistant U.S. Attorney