UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIM. NO. 3:03-CR-22 (AVC) |
| V. | : | |
| FRANK S. CHUANG | : | FEBRUARY 4, 2005 |

### DEFENDANT FRANK S. CHUANG'S SENTENCING MEMORANDUM

**I.    APPLICABLE LAW**

On February 2, 2005, in light of United States v. Booker, 125 S. Ct. 738 (2005), the United States Court of Appeals for the Second Circuit decided United States v. Crosby, No. 03-1675, 2005 WL 240916 (2d Cir. February 2, 2005) which provided the following guidance to the District Courts with respect to sentencing. The holdings of Crosby can be summarized as follows:

1.    Application of the Sentencing Guidelines are no longer mandatory but sentencing judges remain under a duty to "consider" the Sentencing Guidelines, along with other factors listed in 18 U.S.C. 3553 (a).

2.    Consideration of the Guidelines requires a determination of the applicable Guideline ranges, or identification of arguably applicable ranges, and consideration of applicable policy statements. (Sentencing Judge should refer to applicable sections in opinion, not just general reference to the Guidelines).

3.    After consideration of the Sentencing Guidelines, the Sentencing Judge must decide whether to impose a sentence that would have been imposed under the Guidelines (i.e., within applicable Guideline range(s) or within permissible departure authority; OR to impose a non-Guidelines sentence.

4.    The Sentencing Judge is entitled to find all facts appropriate for determining a Guidelines sentence versus a non-Guidelines sentence.

5.    The standard of review will be reasonableness.

Based on the <u>Crosby</u> holding, the defendant respectfully requests that the Court determine the guideline range in accordance with calculations provided by the defendant; determine that a downward departure would be appropriate and/or sentence the defendant with a non-guideline sentence.

## II.   FACTUAL BACKGROUND

Frank S. Chuang stands before this court convicted of violations of 18 U.S.C. § 287, False Claims to the United States Department of Transportation and 26 U.S.C. § 7201, Tax Evasion. The total amount of the fraud due to the false claims was $2,515,720.55. The total tax loss was $1,694.730. The defendant has already paid restitution in the amount of $2,515,720.55. Restitution on the tax loss in the amount of $1,694.730 was paid by the defendant on July 9, 2003.

The defendant's total obligation to the IRS for the tax loss of $1,694,730 was $4,340,949.20 with interest and penalties. As of the date of the entry of pleas on September 24, 2003, the defendant had paid the total tax amount of penalties and taxes of $4,340,949.20.

Contemporaneously with the plea, the defendant entered into a civil settlement with the government in the amount of $3,400,000.00 reduced by the amount of criminal restitution of $1,491,246.56 resulting in a civil assessment of approximately $1,900,000.00 in excess of the actual false claim loss to the government. The total amount paid by the defendant for the above equals $8,765,670.00.

The conviction of the defendant results from the diversion of receipts from contracts with departments of transportation for Connecticut, Rhode Island, New York and Massachusetts. The defendant was the sole owner of L-C Associates, Inc., and L-C

Associate, P.C., a Consulting Engineer (collectively "L-C"), consulting engineering firms located in Rocky Hill, Connecticut. L-C entered into contracts with the departments of transportation in the above-listed states which were either based on a lump sum bid or were based on cost plus overhead. Under a cost plus contract, the state reimburses for all costs incurred by the vendor with a profit margin based in part on overhead costs.

The invoices submitted by L-C on cost plus contracts were fraudulent essentially because the overhead costs were in excess of L-C's actual overhead expenses. It should be noted that L-C's inflated overhead expenses were consistent with the experience of some consulting engineering firms in Connecticut; however, this in no way excuses the fraud committed on the government.

The defendant's scheme to defraud in this case was driven by tax evasion which was accomplished by diverting checks payable to L-C to a BankNorth personal "d/b/a/" account held by the defendant in the name of "Frank Chuang d/b/a L-C Associates." The diverted checks were for payment on lump sum contracts. This diversion of receipts to evade taxes had the corresponding effect of raising L-C's overhead percentage by reducing the gross receipts of L-C while costs were essentially a constant. In other words, the false claims were a product of a tax evasion.

In the stipulated facts, the defendant stipulated that certain hours worked by L-C on lump sum contracts were charged to cost plus contracts, and that L-C employees were performing personal services for the defendant, thereby increasing the overhead costs for L-C. These actions, however, do not give rise to significant financial loss to the United States Government. Simply put, the defendant caused the loss for the false claims by his tax evasion, which gave rise to the bulk of the inflated overhead charges. Of course, this

3

*Rome McGuigan Sabanosh, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

in no way absolves the defendant of his culpability but explains the essential nature of his crime.

Furthermore, as a part of the plea agreement, the defendant agreed to divest himself of all ownership interest in, control or management of L-C and/or any of its affiliated entities, assigns, or successors. L-C agreed to the termination of the defendant's ownership interest as well as any involvement of any of his relatives. The defendant has no management role in L-C at this time and is merely assisting in wrapping up three existing contracts. A description of the contracts is being provided under separate cover. At the present time, L-C has three employees and a part-time employee assisting in finishing one project. No new contracts have been obtained since 2003. The defendant needs to maintain ownership of L-C, but not control, until final tax filings can be accomplished.

<u>Personal Background</u>

Frank S. Chuang was born in Taiwan on September 5, 1941, at a time when Taiwan was occupied by the Japanese military. The Japanese treatment of the native populations was brutal and genocidal. During the Japanese occupation, the defendant lived on his family's farm with his mother, father, older and younger brothers, paternal grandfather and uncle. During this time, the family farm was raided by Japanese forces and the Chuang family's crops were confiscated. The Chuangs regularly hid crops from the Japanese in order to maintain their own sustenance. The discovery of this concealment would most certainly have resulted in execution of the Chuang family. In order to survive, the Chuangs continued their concealment and endured.

At the age of five, when the Japanese had finally departed, the defendant's father was tragically killed, leaving the Chuang family without its guiding patriarch. In 1948, in anticipation of the communist takeover of mainland China, Chiang Kai-shek's forces retreated to Taiwan and remained there after the communist takeover in 1949. The Kuomintang ("**KMT**") takeover of Taiwan resulted in significant oppression of the local population. The Chuang family's crops were taxed so severely by the KMT that they were once again facing starvation. Physical abuse of the native Taiwanese was not uncommon and the defendant's uncle, the manager of a railroad station, was nearly beaten to death. During the defendant's high school years, many students who spoke out against the government disappeared. The defendant's formative years were filled with anxiety and uncertainty, resulting in a paranoid approach to life.

When the defendant's father died, his paternal grandfather became a major influence in his life. Defendant's grandfather instilled a strong work ethic in him and his brothers, as well as an aversion to and distrust of government. The defendant was instilled with a mistrust of government by the constant teaching of his grandfather. Because of work ethic, the defendant was hand-chosen by his grandfather to manage the family farm's finances. The defendant was the "keeper of the books" and soon learned to hide assets from being confiscated. .

The defendant performed well in school and graduated from the National Taiwan University in 1964 with a bachelor's degree in engineering. After serving in the military, the defendant wished to go to the United States and began studying English with a nun who gave him his English name. Formerly his name was Shiann Jea. The defendant emigrated to the United States in 1966 and became a research assistant at the University

5

*Rome McGuigan Sabanosh, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

of Massachusetts ("UMass") at Amherst in 1966. At UMass, he earned his master's degree in environmental engineering. In May of 1971, the defendant earned his Ph.D. While studying at UMass, he met his wife, Lily Chuang, whom he has been married to for over 30 years. While in Taiwan, Lily also attended National Taiwan University where she graduated with a major in mathematics in 1968. In August 1971, Lily and Frank Chuang married and subsequently had a child, Eugene, who is a graduate of Massachusetts Institute of Technology with a doctorate degree in engineering.

The defendant took a job at the University of Connecticut ("UConn") as an instructor and research associate on the Storrs campus where he remained for one year. He later was employed by a consulting engineering firm, Fuss and O'Neill. Subsequently he was employed by another engineering firm, C.E. Maguire, where he remained for 6 years. In 1975, the defendant became a United States citizen. In 1978, he opened up an office for the engineering firm of Hayden & Wegman, but soon after decided to open his own company. In 1981, along with his wife and her brother, the defendant opened a small company L-C Associates, and in 1982 he became its president. Subsequent to the Mianus River Bridge collapse, the State of Connecticut developed an emergency bridge program. L-C Associates soon displayed their proficiency in bridge construction and engineering and began doing business in that field in Connecticut, Massachusetts and New York.

The Chuangs have always had very strong religious convictions. Many Taiwanese, including the defendant and his wife were converted to Christianity by missionaries in Taiwan. They brought their faith with them when they emigrated to the United States. In fact, they met each other at a Chinese Bible study in Amherst,

Massachusetts. They have continued to foster their faith, not only in their son, Eugene, but also in the community. In 1977, the defendant and his wife, with another Chinese friend, co-founded the First Chinese Baptist church on North Main Street in West Hartford where it remains today.

Through the years in Connecticut, the Chuangs have contributed much to both the Chinese community, the church, and the community at large. From being a volunteer assisting the Town of Wethersfield in issues relating to engineering, to providing Chinese students with their tuition to attend seminary, to providing scholarships to Chinese students to attend the University of New Haven, to providing Rocky Hill High School students with financial assistance, to assisting members of the Chinese community with financial aid, the defendant has demonstrated over the years a kind, compassionate and religious personality which is completely in conflict with the crimes for which he stand convicted. To this day, the defendant continues to provide financial aid to missionaries in Taiwan, Singapore and China. The many letters attached to the PSR attest to a side of the defendant that is a reflection of his religious beliefs and his upbringing.

The defendant has continued to support his business and watch as L-C was forced to lay off employees of many years. From approximately 60 employees at the time of the defendant's indictment in January, 2003, L-C has shrunk to four employees. The defendant lives with the pain of knowing that he let down the people who depended on him. To no avail, endless hours were spent trying to save this company for the employees.

### III. SENTENCING GUIDELINES

Because the Court has a duty to consider the sentencing guidelines along with all the factors listed under 18 U.S.C. § 3.5.5.3(a), we have addressed the government's position regarding the application of the sentencing guidelines to this case.

The defendant here stands convicted of violations of 26 U.S.C. § 7201, Tax Evasion and 18 U.S.C. § 287, False Claims. The government, in its calculations, and the defendant have stipulated that the loss resulting from the violations of 18 U.S.C. § 287 is $2,515,720.55 and the loss resulting from the violation of 26 U.S.C. § 7201 is $1,694,730.00. The combined loss equals $4,210,450.55.

The government posits in the Plea Agreement dated September 24, 2003 that these offenses should be grouped together in a single group pursuant to U.S.S.G. § 3D1.2(d), and that the guidelines applicable to the tax offense should be used under U.S.S.G. § 3D1.3(b). In other words, the government arrives at the highest guideline level as calculated by grouping the tax charge, which originally resulted in a tax loss of $1,694,730.00, with the false claims loss of $2,515.720.55, arriving at a total of $4,210,450.55, which equals an offense level of 21 pursuant to U.S.S.G. § 2T.4.1.

The defendant respectfully disagrees with grouping these offenses under U.S.S.G. § 3D1.2(d) and maintains that if grouping should occur it should properly be under U.S.S.G. § 3D1.2(c). If 2(c) is applied, both offenses would be grouped together in a single group and sentencing would be based on the tax offense, pursuant to U.S.S.G. § 3.D1.3(a). This would result in the highest guideline level for either offense being applied and with a loss of $1,694,730.00, the ultimate offense level would be 20. This is

application should be controlled by the language of Subsection (c) which states that when "one of the counts [false claims] embodies conduct that is treated as a specific offense characteristic in or other adjustment to, the guideline applicable to another of the counts, [tax evasion]." This section is particularly applicable where the government has requested an enhancement under U.S.S.G. § 2T.1(b)(1) which would add two levels because the offense involved failure to report illegal income in excess of $10,000.00 in any given year. This is the exact circumstance envisioned in U.S.S.G. § 3D1.2(c).

In support of its position of grouping under U.S.S.G. § 3D1.2(d), the government cites United States v. Gordon, 291 F.3d 181 (2d Cir. 2002). It is the defendant's position that the holding in Gordon is not controlling in this case. Gordon concerned a mail fraud scheme with numerous victims and concealment of the income from the mail fraud to evade taxes. This case, however, is essentially a federal income tax fraud which reduced the gross income of the defendant's company L-C Associates, Inc. (the money was deposited into a d/b/a account) inflating the overhead calculations for various state Department of Transportation cost-plus contracts. The defendant's actions in this case, in fact, were the reverse of the actions in the Gordon case. Here the defendant was not hiding stolen income to evade taxes, but was filing false claims because of his evasion of taxes. In addition, the defendant is not charged in the instant case with mail fraud as the defendant was in Gordon, but is charged with violations of 18 U.S.C. § 287, false claims. In addition, in this case case, the guideline calculations under 18 U.S.C. § 287 and 26 U.S.C. § 7201 are not essentially the same. Indeed, application of the tax violation in this case results in a higher guidelines range than the false claims violations.

Under these circumstances, the provisions of U.S.S.G. § 3D1.2(c) are directly on point and are the appropriate grouping section for this particular case.

Should the court conclude that the two offenses should be grouped in a single group under U.S.S.G. § 3.D1.2(d), the defendant would argue that an additional two-level enhancement for failure to report $10,000.00 of income from illegal activity should not be applied. Under the facts of this case, the application of U.S.S.G. § 2T1.1(b)(1) and of U.S.S.G. § 3.D1.2(d) to the same conduct would constitute a double enhancement. The government's position is that the entire amount of the false claims should be added to the amount of the tax evasion causing an increase in the guideline range. All of the false claims then are being punished in the tax fraud calculation and additional punishment under § 2T1.1(b)(1) is not in keeping with the spirit of the guidelines. An enhancement under U.S.S.G. § 2T1.1(b)(1) where the tax fraud is being grouped with a false claims amount under U.S. S.G. § 3D1.2(d) is the application of two enhancements for the very same conduct and in protection of the same interests.

For the foregoing reasons, the defendant requests that the grouping be determined under U.S.S.G. § 3D1.2(c) resulting in an offense level of 20.

Sophisticated Concealment

In addition, the government argues on Page 6 of the Plea Agreement that two levels should be added because the offense involved "sophisticated means" pursuant to U.S.S.G. § 2T1.1(b)(2). The defendant would argue that under U.S.S.G. § 2T1.1(b)(2), Tax Evasion, which is the controlling count, that this offense did not involve "sophisticated concealment." Under the guidelines, sophisticated concealment is defined as:

10

*Rome McGuigan Sabanosh, P.C.* • *Attorneys at Law*
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

> "... especially complex or especially intricate offense conduct in which deliberate steps are taken to make the offense, or its extent, difficult to detect. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore bank accounts ordinarily indicates sophisticated concealment."

In the instant case, the defendant essentially took no steps to "make the offense or its extent difficult to detect." This is not a "complex or especially intricate offense." The defendant simply deposited checks from departments of transportation of diverse states for consulting engineering services directly into a "D/B/A/" account set up as "Frank Chuang d/b/a L-C Associates," rather than depositing the checks into his company's, L-C Associates, Inc., account. This is the simplest tax fraud imaginable. The defendant did not even use cash to hide transactions. The defendant did not hide assets, or transactions through "fictitious entities." No "corporate shells" or "offshore bank accounts" were used. The defendant used his own name and deposited the money openly and notoriously. In short, an enhancement under U.S.S.G. § 2T1.1(b)(2) for sophisticated concealment appears to be unwarranted.

The resulting offense level, assuming a two-level enhancement under U.S.S.G. § 2T1.1(b)(1), and the use of U.S.S.G. § 3D1.2(c), would be level 22 which is reduced by three levels for acceptance of responsibility under U.S.S.G. § 3B1.1(b), resulting in an offense level of 19, with a guideline calculation of 30-37 months, and a fine under U.S.S.G. § 5B1.2(c)(3) of $6,000.00 to $60,000.00.

Of course, if the Court groups under U.S.S.G. § 3D1.2(d), the defendant would agree that the tax loss of $4,210,450.55 would result in an offense level at 21, but would claim that there should be no enhancements under U.S.S.G. § 2T1.1(b)(1) as this will

result in double enhancement for the same conduct and for the protection of the same interest.

V.     **GROUNDS FOR DOWNWARD DEPARTURE AND/OR GROUNDS FOR IMPOSING A NON-GUIDELINE SENTENCE UNDER CROSBY**

As to the fine that may be imposed, defendants respectfully request a downward departure from the sentencing guidelines from the Court as to incarceration and the range of a fine, and request that the Court not impose a criminal fine based on the fact that the defendant has entered into a separate civil settlement in which the defendant paid $3.4 million dollars of which $2,500,000.00 was restitution and $1,900,000.00 was civil damages and $4,340,949.00 to the IRS for total payments of approximately $8,765,670.00.

VI.    **GROUNDS FOR DOWNWARD DEPARTURE**

1.     **Acceptance of Responsibility.** Pursuant to the plea agreement, both parties recommend that under U.S.S.G. § 3E1.1 that the Court reduce the defendant's offense level for acceptance of responsibility by three levels, assuming an adjusted offense level of 16 or greater as set forth in section 3E1.1(b).

2.     **Age.** The defendant is a sixty-three year old man suffering from depression, high blood pressure, sleep disorders, high cholesterol, false perception, and psychotic thinking.[1] The defendant requires a daily regimen of strong ameliorating agents, which include Benicar (high blood pressure), Lipitor (cholesterol), Ambien (sleep disorders), Risperdal (psychotropic agent), and Celexa (hypertension). In 2002, Dr. Chuang suffered a stroke and continues to suffer from intercranial vessel disease.[2]

---

[1] Please see Dr. Black's January 15, 2004 report and December 30, 2004 supplemental report.
[2] See PSR at page 11.

According to Dr. Black's report, there existed a serious risk of suicide were the defendant to be incarcerated in a federal penitentiary.

As the Court is aware, the defendant sought to spend six months in Sri Lanka volunteering his services as an engineer to help design repairs to that country's water, sewer and transportation services in light of the devastation experienced from the tsunami that struck Sri Lanka on December 26, 2004. He would be financially supported entirely by his wife. The defendant respectfully requests that the Court impose a sentence that would enable him to render this extraordinary humanitarian service to a country desperately in need of such assistance. A copy of a letter from HELP-O, Human Rights Unit, is attached for the Court's review.

3. **Diminished Capacity.** On April 26, 2001, a federal search warrant was served upon the offices of L-C. On January 30, 2003 both L-C and the defendant were formally indicted by a Grand Jury in the United States District Court for the District of Connecticut. During the approximately eighteen months from the time the search warrant was served until the indictments were handed down, the defendant continued to deposit Department of Transportation ["DOT"] checks from various states payable to L-C Associates, Inc into his personal account at BankNorth with the account name: "Frank S. Chuang d/b/a L-C Associates."

As of the date the search warrant was issued, the defendant knew that there was probable cause that he had committed fraud. Defendant consulted with legal counsel; and was advised that his wrongful conduct made him the target of a Federal Grand Jury investigation. In spite of all the information available to him at the time, the defendant continued to deposit, openly and notoriously, DOT checks into his personal d/b/a account

in full view of federal authorities, taking no precautions to conceal any of the glaring illegality of his conduct.

U.S.S.G. § 5K2.13 states that the Court may, "… sentence below the applicable guideline range … if the defendant committed the offense while suffering from a significantly reduced mental capacity." Application Note 1 of the section states,

> "'Significantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior compromising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrong."

The defendant clearly understood the wrongful nature of what he was doing; however, his ability to control the behavior he knew was wrong was significantly impaired. In his report, Dr. Black concludes that the defendant suffered from "paranoid delusional thinking" which compelled him to project his personal fears into his environment and to commit the crimes for which he stands convicted. Dr. Black points out that the defendant continued to engage in blatant tax evasion subsequent to a search warrant being served on his business and that after his indictment the defendant didn't even trust his attorneys whom he thought were in league against him. In fact, some of the complaints by employees contained in the PSR are consistent with the defendant's paranoid state. His mistrust of employees while being a kind and generous employer is a classic example of his mental state. The guidelines recognize that a downward departure for diminished mental capacity is permitted. The concept of diminished capacity causing irresistible impulse has long been recognized in our criminal law and relates back to English common law. See People v. Hubert, 119 Cal. 216 (1897).

14

*Rome McGuigan Sabanosh, P.C.* • Attorneys at Law
One State Street • Hartford, Connecticut 06103-3101 • (860) 549-1000 • Fax (860) 724-3921 • Juris No. 27726

In the instant case, a downward departure is warranted because there is a direct causal connection between the defendant's mental condition and his hiding income from the government which warrants the application of U.S.S.G. § 5K2.13. The defendant's disorder not only affects his motive for the crime but, more importantly, reflects his compulsive need to hide income. His compulsion is clearly demonstrated by his inability to stop with the government having already served a search warrant upon him and essentially representing "the policeman at his elbow." The real question is "Did the compulsion significantly impair the defendant's ability to control the offense conduct at the time of the offense?" Here it did. For the foregoing reasons, we respectfully request the court to depart downward due to the diminished volitional control exhibited by the defendant. This case has some similarity to the conclusion of the district court for the Second Circuit in U.S. v. Jagmohan, 909 F.2d 61 (2d Cir. 1990) where the court departed under U.S.S.G. §5K2.13 for a number of reasons including the fact that a personal check was used in a bribery.

4. **Other Mitigating Circumstances**

Pursuant to U.S.S.G. § 5K2.0(a)(1)(A) the Court may depart downward if the Court finds that mitigating circumstances exist of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C § 3553(a)(2), should result in a sentence different from that described.[3] 18 U.S.C § 3553(a)(2) requires that courts deliver sentences that reflect the seriousness of the offense, promote respect for the law,

---

[3] Note that the Court in United States v. Crosby, No. 03-1675, 2005 WL 240916, at (2d. Cir. February 2, 2005) (Sentencing Guidelines) severed and excised the requirements that downward departures conform with 18 U.S.C. § 3553(b).

provide just punishment, afford adequate deterrence, and protect the public from further crimes.

Although the crimes for which the defendant pleaded guilty are certainly of a serious nature in terms of the monetary loss, the crimes are certainly not of a violent or heinous nature. As stated before, as of the time of sentencing the defendant has provided full restitution and ameliorated the loss to the United States government and the various states from whom the money was misappropriated. With regards to incapacitation and protection of the public, the defendant represents no potential threat to the public.

In terms of just punishment and deterrence to criminal conduct the undersigned adduces the collateral consequences of the defendant's conduct. As a result of the indictments handed down upon his companies, the defendant has lost his means of livelihood. The defendant's divestment of his interest in his companies has left L-C as a mere shell. It is going out of business. At the time L-C was indicted it employed approximately 60 employees. As of the date of this memorandum there are only three full-time employees and one part-time employee left. The defendant accepts full responsibility for these layoffs, and remorseful for the plight of his displaced employees, Dr. Chuang worked tirelessly to help them find new jobs in an effort to spare their families the cost of long-term unemployment.

As of the date of this memorandum, as an additional collateral consequence Dr. Chuang faces the loss of his future income. On November 4, 2004 Dr. Chuang was notified that his Professional Engineer's license may be revoked pursuant to a hearing before the State of Connecticut Department of Consumer Protection. With the loss of his business, the emotional drain of watching his employees let go from L-C, and the very

real possibility of losing his license, the collateral consequences of Dr. Chuang's conduct serve as a just punishment for his conduct and a ringing deterrent to the public at large. The further punishment of incarceration for Dr. Chuang is unneeded to serve the purposes of 18 U.S.C § 3553(a)(2), and the purposes of <u>United States v. Crosby</u>, No. 03-1675, 2005 WL 240916 (2d Cir. February 2, 2005).

## CONCLUSION

Based on the foregoing the defendant respectfully requests that this Court determine the guideline ranges in accordance with the calculations provided above, determine that a downward departure in the instant case is warranted, and/or impose a non-guideline sentence.

Pursuant to U.S.S.G. § 5H1.1 and the considerations enumerated in <u>United States v. Crosby</u>, No. 03-1675, 2005 WL 240916 (2d. Cir. February 2, 2005), the undersigned asks the Court to depart from the Sentencing Guidelines and order the defendant to perform a period of probation with a condition that he serve six months at his expense in Sri Lanka assisting in the rebuilding of the infrastructure of that country. In addition, a sentence of home confinement thereafter would appear to be appropriate.

**DEFENDANT**
**FRANK S. CHUANG**

By _/s/ Austin J. McGuigan_
Austin J. McGuigan, Esq.
Federal Bar No. CT01004
Rome McGuigan, P.C.
One State Street
Hartford, CT 06103-3101
860-549-1000
860-724-3921 (fax)
His Attorney

## CERTIFICATE OF SERVICE

This is to certify that on the 4th day of February, 2005, a copy of the foregoing was mailed, postage prepaid, via U.S. mail, to:

*[handwritten: hand delivery]*

James A. Wade, Esq.
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103

William J. Nardini, Esq.
Assistant U.S. Attorney
157 Church Street, 23rd Floor
New Haven, CT 06510

Brian Topor
United State's Probation Officer
U.S. Probation Office
450 Main Street
Hartford, CT 06103

_____
Austin J. McGuigan

11797-1/393737